# EXHIBIT D

| | |
|---|---|
| District Court, Jefferson County, Colorado<br>100 Jefferson County Parkway<br>Golden, Colorado 80401 | DATE FILED: March 5, 2015 8:24 AM |
| CHRISTOPHER CONE,<br><br>               Plaintiff,<br>v.<br><br>MEDICAL IMAGING HOLDINGS, INC., a<br>Delaware Corporation; CONSENSYS<br>IMAGING SERVICE, INC., a Delaware<br>Corporation,<br>Galen Partners IV, a Delaware Limited<br>Partnership, Galen Partners V, a Delaware<br>Limited Partnership, Galen International IV,<br>Galen International V, a Delaware Limited<br>Partnership, Galen Employee IV, a Delaware<br>Limited Partnership, David Jahns, David<br>Azad, Bill Williams, Jeff Soinski,<br><br>               Defendants. | ▲    COURT USE ONLY<br><br>Case Number:<br><br>Division:    Courtroom:<br><br>Jury Trial Demanded |
| **COMPLAINT** | |

Plaintiff Christopher Cone, by and through undersigned counsel, brings this action for breach of the Amended and Restated Certificate of Incorporation of Medical Imaging Holdings, Inc., breach of the fiduciary duties of loyalty and care, fraudulent misrepresentation, and negligent misrepresentation, against Medical Imaging Holdings, Inc. ("MIH"), its wholly owned subsidiary Consensys Imaging Service, Inc. ("CIS"), its majority shareholder Galen Partners, and certain members of the Board of Directors of Medical Imaging Holdings, Inc., Consensys Imaging Service,

Inc. and Unisyn Medical Technologies, Inc. that were installed by and represented the interests of Galen Partners (the "Galen Directors").   In support of this verified complaint, Plaintiff states as follows:

## I.    The Defendants

1.    MIH is a Delaware corporation with its principal place of business at 680 Washington Blvd., 11th Floor, Stamford, CT 06901.  MIH was the corporate parent of Unisyn Medical Technologies ("Unisyn"), a Delaware corporation with its principal place of business in Golden, Colorado.

2.    Consensys Imaging Service ("CIS") is a Delaware corporation with its principal place of business at 615 Industrial Dr., Cary, IL 60013. CIS is the corporate successor to Unisyn.

3.    Plaintiff Christopher Cone is a stockholder of record of MIH, and has been a stockholder of MIH since it was created in 2009. Previously, Plaintiff was the founder and principal stockholder of Echoserve, LLC ("Echoserve"), a company founded and based in Golden, Colorado, and one of three entities that were combined to form MIH in 2009.

4.    Galen Partners IV, Galen Partners V, Galen International IV, Galen International V, and Galen Employee IV (collectively, "Galen Partners") are Delaware Limited Partnerships with their principal place of

business in Stamford, Connecticut. Galen Partners is in the business of private equity funding. Through various investment funds that it controls, Galen Partners has been the majority and controlling shareholder of MIH, CIS, and Unisyn since 2009. Galen Partners was also the majority shareholder of Echoserve from the time it invested in the company in 2006.

5.     Defendant David Jahns is a Managing Partner of Galen Partners. Mr. Jahns has been a member of the Boards of Directors of MIH, CIS, Unisyn, and Echoserve ("the Boards") since 2007.  Defendant Jahns is a resident of Connecticut.

6.     Defendant David Azad was, at all relevant times, a Managing Director of Galen Partners. Defendant Azad has been a member of the Boards of Directors of MIH, Unisyn, CIS and Echoserve. Defendant. Azad served on the Boards from 2006 – 2014.  Defendant Azad is a resident of New York.

7.     Defendant Jeffrey Soinski was a "Special Venture Partner" of Galen, and was appointed by Galen in 2009 to the MIH, Unisyn, and CIS Boards of Directors.  Defendant Soinski is a resident of Utah.

8.     Defendant Bill Williams was a "Special Venture Partner" of Galen, and was appointed by Galen to the Echoserve, Inc. Board in 2006 and to the MIH and Unisyn Boards in 2009, and served on the MIH and

3

Unisyn Boards until 2013. Defendant Williams was ostensibly an "independent director," but in reality he served the interests of Galen, serving at the will of Galen, acting in his capacity as a Galen "Special Venture Partner." Defendant Williams is a resident of Colorado.

9.     Defendants Jahns, Azad, Soinski, and Williams are collectively referred to in this Complaint as the "Galen Directors." They served the interests of Galen Partners and were appointed to the Boards by Galen.

10.     Defendants Jahns and Azad have regularly traveled to Colorado to do business, including for Board meetings. Defendant Soinski spent three out of five business days in Colorado working for Unisyn, and attended Board meetings in Colorado. Defendant Williams lives in Colorado, and attended Board meetings for MIH and Unisyn in Colorado. They have purposefully availed themselves of the jurisdiction of the Colorado courts, by, among other things, engaging in conduct that gives rise to the causes of action described herein in Colorado.

## II.     Factual Background

11.     In mid-2013, MIH sold substantially all of Unisyn's assets, including the name Unisyn, to GE Healthcare, Inc. At the time of the sale, Unisyn employed over 150 people in Golden, Colorado. Unisyn was

headquartered in a 25,000 square foot facility at the entrance to Golden Gate
Canyon in Jefferson County.

12.     After the sale to GE Healthcare, MIH's remaining assets were
put into a new company, now named Consensys Imaging Service, Inc.
("CIS").  CIS is what remains of the business of its corporate predecessor,
Unisyn.

### Plaintiff was a Founder of a CIS Predecessor Company, Echoserve

13.     In 2005, Plaintiff formed Echoserve with two other individuals.
Plaintiff owned the majority of Echoserve shares, having provided most of
its initial capital. Echoserve started with three employees and a personal
bank guarantee from Plaintiff, secured by his house and other personal
assets. Since its inception, Echoserve was located in Golden, Colorado.

14.     Echoserve was a provider of service and parts for medical
diagnostic imaging equipment. Its business was to service and repair
ultrasound equipment for medical providers, creating substantial savings
over what they were being charged by the original manufacturers. The
company grew rapidly, and in late 2006, Echoserve was approached by
Galen Partners, a private equity firm based in New York at the time.

15.     Galen Partners represented to Plaintiff and the other founders of Echoserve that Galen provides "collaborative capital," working in partnership with the founders of companies to realize market opportunities.

16.     Relying on these representations, the Echoserve founders agreed to sell 51% of the equity in Echoserve to Galen's Fund IV (which is managed by Galen) for $8,500,000.   Plaintiff negotiated an agreement whereby Galen's Fund IV would have non-participating, non-convertible, preferred shares in Echoserve, with a dividend rate of 5% of par per year. Plaintiff was careful to ensure that the terms of the agreement called for non-participating, non-convertible, preferred shares.

17.     Under Plaintiff's leadership, Echoserve experienced significant growth. Its annual revenues increased to almost $15 million in just a couple of years. Echoserve grew from a handful of employees to more than sixty in that timeframe. In 2009, Echoserve moved into a new state-of-the-art 25,000 square foot facility that Plaintiff personally designed specifically for the company. The new facility housed Echoserve's manufacturing operations, a lab, and administrative space.

18.     Echoserve's customer list grew to over 250 active customers by the end of 2009. Large accounts, such as Banner Health, Baylor Healthcare, BayCare Health System, Kaiser Permanente, Catholic Health Initiatives,

Carestream and many others were developed. Plaintiff built a nationwide service organization with many of the leading healthcare providers in the United States as customers. Echoserve became a recognized leader in the medical imaging service market and never required additional financing.

19. Also during this time, Plaintiff developed and executed a business strategy for Echoserve based on both organic growth and strategic acquisitions. He proposed that Echoserve acquire Sonora Medical Systems ("Sonora"), a complementary Colorado-based company owning substantial intellectual property. Plaintiff realized that the intellectual property would enhance the value of Echoserve, eventually making it a more attractive acquisition target. Plaintiff worked for months, as the CEO of Echoserve, to execute this strategy and to complete the acquisition of Sonora.

### *2009:  MIH Was Formed When Galen Partners, the Majority Stockholder, Unilaterally Changed the Terms of its Equity Investment in Echoserve*

20. In mid-2009, Galen informed Plaintiff that instead of Echoserve acquiring Sonora, it had unilaterally decided to "liquidate" Echoserve and to combine Sonora, Echoserve, and another company called Barrington Medical, based in Cary, Illinois, into a new holding company, which would be called Medical Imaging Holdings, Inc. (MIH). The corporate headquarters would remain in Golden, Colorado.

21.     Through the transaction, Galen fundamentally changed the terms of its previously-negotiated agreement with Echoserve's founders. Galen, which previously held *non-convertible* Preferred A shares with a *5%* dividend rate in Echoserve, had its Preferred A shares converted into MIH preferred shares that were *convertible* into common and carried a *9.5%* dividend rate.

22.     While Galen had its preferred stock redeemed and converted into a different, more valuable instrument in the new company, Galen did not do the same for holders of Echoserve's common stock, who never got an opportunity to redeem their shares for either cash, or shares on different terms in the new company.

23.     Persons affiliated with Galen later referred to this transaction as "the cram down."

24.     The cram down was the beginning of a pattern of conduct whereby Galen and the directors representing Galen's interests on the Boards of Echoserve, Unisyn, MIH, and later, CIS, as the majority shareholder in all of these entities, put its interests ahead of those of the minority shareholders.

### *After Galen's Representations about the Financial Outlook of the Combined Companies, Plaintiff Made a Substantial Investment in MIH*

25.    After the cram down, because Galen made certain representations about the value of the combined companies, Plaintiff purchased $500,000 worth of shares of MIH's newly issued Series A Preferred stock.

26.    Plaintiff is thus the owner of record of 1,831,355 shares of MIH Common Stock and 718,829 shares of MIH Series A Preferred Stock. Plaintiff is the largest individual, non-entity, holder of MIH preferred stock.

27.    Before deciding to purchase a half of a million dollars in additional shares, Plaintiff reviewed pro-forma income statements and balance sheets for the combined entities comprising MIH (which would later become Unisyn). These pro-forma financial statements showed combined revenue of more than $35,000,000 per year and profitability. The information was compiled and provided to Plaintiff by Galen Partners, through Defendant Azad, and was designed to induce Plaintiff to purchase additional shares in MIH with his own funds in what Galen represented would be a valuable entity. The representations were also intended to appease Plaintiff after the cram down.

28.    In reliance on the financial pro-formas provided, Plaintiff, on behalf of Echoserve minority shareholders, acquiesced to the transaction and invested more of his own personal funds.

29.    As a result of the 2009 transaction, Unisyn became the new operating entity. Unisyn was a wholly owned subsidiary of MIH.

30.    Upon the formation of Unisyn, after his additional investment, Plaintiff became the COO and President of Unisyn, and served on the MIH Board of Directors as a common stockholder board representative. Eventually Plaintiff became the only common stockholder board representative.

### The Information Provided to Plaintiff to Induce
### Additional Investment in Unisyn was False

31.    Unbeknownst to Plaintiff, the information Galen provided him was false.

32.    Two individuals, however, discovered the falsity of the information. They were Jeff Soinski and Dan Faath.

33.    Jeff Soinski became the CEO of Unisyn, installed by Galen. Mr. Soinski was a "special Galen Partner," as represented on the Galen website at the time. Mr. Soinki had a long history with Galen Partners, working for other Galen portfolio companies. Mr. Soinski joined the boards of Unisyn and MIH in September 2009.

10

34.    Dan Faath was the Galen installed CFO of Unisyn. He too had previously worked for other Galen-backed companies.

35.    In order to induce Mr. Faath to leave his then-current company to join Unisyn, upon information and belief, Galen made the same misrepresentations to Mr. Faath about the combined financials that it made to Plaintiff.

36.    After his retention, Mr. Faath was charged with structuring the accounting and financial framework for MIH. In attempting to integrate the financial information for the three predecessor entities, on information and belief, Mr. Faath uncovered substantial discrepancies between the Galen representations and reality. In particular, Mr. Faath discovered that the value of the assets of Barrington, one of the three merged entities, was inflated and that in fact that acquisition was not as valuable as represented by Galen. For example, upon information and belief, the approach that Barrington took to value inventories was not in accordance with Generally Accepted Accounting Principles (GAAP), which led to an over-valuation of Barrington's spare part stock.

37.    Upon information and belief, Mr. Faath uncovered that the pro-forma financial statements provided to investors in MIH were wildly overstated in terms of combined revenues, revenue quality, profitability,

account receivables/account payable ratios, and inventory valuations. Mr. Faath took this information to the CEO, Jeff Soinski.

38.     Based on this information, substantial downward revisions were eventually made to the MIH pro-formas, but the extent of, and reasons for those reductions were never communicated to investors, including Plaintiff. No adjustments were made to stock valuations, despite the fact that the revised numbers indicated a substantially less valuable company than Galen had represented.

39.     Galen intentionally concealed from Plaintiff the misrepresentations regarding the post-combination pro-formas.  Galen has never provided Plaintiff with the financial information underlying either the original or revised pro-formas. Nor did Plaintiff have access to the financial information or any of the other "due diligence" information for Barrington, the company that was substantially overvalued. As a result, it is only after Galen liquidated substantially all of the assets of the company, years later, and after Plaintiff learned that Galen had made additional distributions to Soinski and Faath out of the proceeds of that sale (detailed below) that Plaintiff came to suspect the full extent of the Galen misrepresentations and the motivation behind those post-asset sale payments.

40.    Unisyn's actual financial performance never reached the amounts that Plaintiff was provided in the misstated pro formas.

### 2013:  MIH Sold the Assets from Unisyn's Transactional Business to GE HealthCare, Withholding from Plaintiff Critical Information About the Planned Use of Proceeds of the Asset Sale

41.    By 2013, Galen determined to attempt to liquidate all or substantially all of Unisyn.

42.    As a result, in May 2013, GE Healthcare acquired the assets of Unisyn's transactional business from MIH for approximately $20 million (the "Asset Sale").

43.    As part of the Asset Sale, GE purchased the "Unisyn Medical Technologies" trademarks.  The remaining holdings of MIH were transferred to CIS and CIS became the corporate successor to Unisyn.

44.    Plaintiff was the common stockholder Board Representative during the time that the Asset Sale to GE was being negotiated and considered by MIH.

45.    However, Galen withheld from Plaintiff critical details of the transaction, including the planned use of the proceeds.

46.    At the time the transaction with GE was being negotiated and finalized, Plaintiff was routinely dismissed from MIH Board meetings with the explanation that only the "outside directors" were allowed to meet.

13

However, Jeff Soinski, the Galen-installed CEO of Unisyn, who was not an outside director, would remain at the meetings after Plaintiff was dismissed.

47.    Defendants Jahns, Azad, Soinski, and Williams would remain in the Board meetings after dismissing Cone, the minority shareholder representative.

48.    Upon information and belief, the remaining Board members were discussing, among other things, the payout that the Galen-installed executives would receive upon an asset sale to GE.

49.    Right after the Asset Sale was consummated, MIH, at the direction of the Galen Board Members, went ahead and made payouts to certain executives, including Mr. Soinski and Mr. Faath.  Upon information and belief, these payments were not made pursuant to bona fide compensation arrangements. Instead, they were made in order to compensate the Galen executives for Galen's own misrepresentations and potential liabilities regarding the true value of Unisyn.

50.    As described above, certain Galen-installed executives, in particular the CFO Mr. Faath and the CEO Mr. Soinski, were led to join Unisyn, and in the case of Mr. Soinski, to invest personal funds, by Galen's misrepresentations about Unisyn's financial condition.

14

51.     The CFO and the CEO, however, had access to the complete financial records of Unisyn's corporate predecessors, including Barrington, and all of the corporate information necessary to discover the falsity of the financial projections upon which they relied.

52.     Upon information and belief, to appease Mr. Faath and to protect against potential claims of misrepresentation and fraudulent inducement against Galen Partners, Mr. Jahns and Mr. Azad (two of Galen's Board representatives) re-negotiated their deal with Mr. Faath. As Plaintiff learned in the summer of 2014, a year after the Asset Sale, Jahns and Azad promised Faath that upon a "change in control" of the company, they would pay him out a certain amount. During the conversation with Plaintiff in which this was recounted, Mr. Faath told Plaintiff that this provision was not in his original employment agreement. Instead, he re-negotiated his deal upon learning that the earlier representations about the combined companies were false.

53.     Upon information and belief, Mr. Soinski also understood that Galen has misrepresented the potential upside of joining Unisyn, and was paid out from proceeds of the Asset Sale.

54.     A demand on the Board to investigate the bona fides of the payments to the Galen-installed executives would be futile, because the majority of the Board is controlled by Galen-installed, interested directors.

55.     Galen's Directors also failed to provide Plaintiff with other critical information about the planned use of the proceeds from the Asset Sale. The directors represented to Plaintiff that the sale would be in the best interests of the company's shareholders. They also represented that the sale would constitute a "Liquidation Event" under the Second Amended and Restated Certificate of Incorporation of MIH (the "MIH Charter"), which would require that the proceeds of the sale be distributed to shareholders, including Plaintiff. But in fact since the sale, Galen and its directors have caused CIS, and subsequently MIH, to retain to the proceeds of the sale, contrary to the MIH Charter. At the same time, a substantial portion of the funds received from the sale have been wasted as a result of mismanagement by the Galen-installed MIH management team.

56.     In fact, Plaintiff learned from Mr. Jahns in the summer of 2014 that over a full 40% of the proceeds from the Asset Sale were gone. Some of the proceeds went to pay off the Galen-installed executives, investment bankers, costs that Galen claim relate to "transition services," and other

expenses that were incurred only because there was a change in control pursuant to the Asset Sale.

57.     Had Plaintiff known that well over 40% of the proceeds of the Asset Sale would immediately disappear to expenses that would not have been incurred had there been no sale, and that the Galen Directors would hold up any return of the remaining capital because of their own self-interests, as detailed below, he would not have voted for the transaction.

58.     The failure to provide Plaintiff with material information about the planned use of proceeds from the Asset Sale is part of a Galen pattern of withholding information from minority shareholders, to their detriment, in order to induce them to acquiesce to transactions that otherwise would not be in their interests.

### Galen Directors Have Since Caused MIH to Fail to Make a Distribution Pursuant to the MIH Charter

59.     Under the terms of the MIH Charter, MIH is required to distribute the proceeds of any "Liquidation Event."

60.     Galen has admitted that the Asset Sale was a "Liquidation Event." However, over a year and a half has passed since the Asset Sale, and MIH has not yet distributed the proceeds to its stockholders.

17

61.     Galen has concealed the reason or reasons for its refusal to distribute the proceeds, and, for over a year after the Asset Sale, led Plaintiff to believe that the proceeds would be returned.

62.     In 2013 and again at the beginning of 2014, Galen's Dave Jahns told Plaintiff that it was delaying the required return of capital to MIH stockholders for "tax reasons." As he described it, the "tax reasons" had nothing to do with MIH's tax planning, but instead related to Galen's own fund investors. Upon information and belief, the "tax reasons" that held up the distribution to MIH's shareholders were peculiar to *Galen* and are not pertinent to the other MIH stockholders.

63.     Upon information and belief, Galen's Directors caused MIH to violate its Charter in holding the proceeds of the Asset Sale in furtherance of Galen's own interests to the detriment of MIH's co-investor minority shareholders.

### Galen Directors Caused MIH and CIS to Refuse to Provide Financial Information and the Books and Records to Plaintiff

64.     Despite the fact that Plaintiff holds substantial interests in MIH and CIS, after the Asset Sale, Galen's Directors refused to provide Plaintiff with even the most basic financial information about the company, including any information regarding the use of the Asset Sale proceeds or plans for their distribution.

18

65.     After the Asset Sale, Plaintiff repeatedly requested that MIH account for the proceeds of the Asset Sale. MIH, through Galen Partners, refused to provide such accounting.  Galen Directors also refused to provide Plaintiff with any financial information to determine whether in fact substantially all of MIH's assets had been sold to GE.

### June 2014: Galen's Jahns Sent a Release of All Claims; Plaintiff Did Not Sign It

66.     Plaintiff waited almost a year for the proceeds of the sale to be distributed. Every time he asked about the distribution, he was told that it was in the works, and would be occurring in the near future, pending some issues that Galen needed to work out (including the Galen tax issues mentioned above). Defendant Jahns repeatedly led Plaintiff to believe that MIH would follow the MIH Charter and make the distribution.

67.     In May 2014, Plaintiff again called Jahns to inquire about the status of the proceeds for the Asset Sale, and about CIS's financial position. Jahns ignored Plaintiff's request for CIS's financial statements, but again led Plaintiff to believe that the capital return from the Asset Sale was imminent. Plaintiff understood that the return would be occurring within a matter of days or weeks, sometime in June 2014.

68.     However, in a call between Plaintiff and Jahns on May 27, 2014, Jahns requested that Plaintiff sign a broad-reaching, general release of

claims. Plaintiff asked why. Jahns provided no coherent explanation. Plaintiff asked if other common stockholders or preferred stockholders had been asked to sign the Release.  Jahns did not answer Plaintiff's question.

69.    Following the conversation, Jahns sent Plaintiff the requested release. The release would have released MIH, and any stockholder (including Galen Partners), from all liability "arising out of, or in any way connected with the Asset Sale."  The requested release purported to release all claims, "known or unknown," related "in any way" to the Asset Sale.

70.    Jahns led Plaintiff to believe that signing the release was necessary in order for Galen to finally issue the return of capital to which Plaintiff already was already entitled as a stockholder.

71.    The night before Plaintiff received the release, he learned for the first time from Mr. Faath that certain extraordinary payments had already been made out of the proceeds from the Asset Sale to some of the Galen-installed executives.

72.    Plaintiff did not sign the requested release, but instead asked (again) for information related to the use of the proceeds from the Asset Sale. This time, Jahns sent a one page high-level summary document entitled "Unisyn Medical 2013 GE Transaction Waterfall." The "Transaction

Waterfall" contained only seven summary line items and no supporting detail.

### Plaintiff Learned that Over 40% of the Proceeds from the $20 M Asset Sale Have Been Spent

73.    The "GE Transaction Waterfall" raised more questions than it answered.  As discussed above, Plaintiff learned for the first time that 44% of the proceeds of the Asset Sale had already been spent.

74.    For example, the one page document indicated that $1,307,966.00 was paid as "severance/bonuses/employee benefit accruals." This category contained in part the amounts Plaintiff, along with others, received pursuant to ordinary severance agreements. However, the amount recorded as "severance/bonuses/employee benefit accruals" also included the additional payments to the Galen-installed executives – payments that were not justified as ordinary compensation but instead, as detailed above, were essentially make up payments because their MIH stock options were not as valuable as Galen had represented they would be.

75.    The CFO—Faath—acknowledged that Galen knew the payment to him would "raise eyebrows."

76.    Another summary category in the "GE Transaction Waterfall," "Transition Expenses for Service Standalone Business," represented an additional sizeable chunk from the proceeds of the sale that had already been

used. Again, Galen Directors failed to disclose to Plaintiff that this large amount of proceeds from the Asset Sale would immediately disappear from the balance sheet, making the sale substantially less beneficial than represented.

### Plaintiff's Repeated Requests for Books and Records, including Plaintiff's Section 220 Demand

77.     After having been asked to execute a general release for no apparent reason, Plaintiff determined to investigate and retained counsel.

78.     On June 4, 2014, Plaintiff's counsel sent a formal request for certain MIH information. Plaintiff's request for information was made pursuant to Section 1.2 of the MIH Investor Rights Agreement dated September 18, 2009.

79.     MIH's lawyer, acting at the direction of Galen, responded. The response denied access to the information, in breach of Section 1.2 of the Investor Rights Agreement, which requires the Company to "permit any Investor to visit and inspect the properties of the Company, to examine its corporate and financial records and make copies thereof and to discuss its affairs, finances, and accounts with its executive officers."

80.     MIH's counsel asserted that Plaintiff was not entitled to have any representative (such as his legal counsel) assist in his review of any MIH books and records. Nothing in the Investor Rights Agreement, or any

applicable law, precludes a minority stockholder from having legal counsel assist in reviewing corporate records for purposes of investigating potential wrongdoing.

81.    In a continuing pattern of concealment and obfuscation, the response also claimed that Plaintiff had no right of access to the books and records of CIS, despite the fact that CIS is a wholly owned subsidiary of MIH.

82.    Finally, on September 8, 2014, after meeting with repeated objections to his requests for information, Plaintiff filed an action in Delaware Chancery Court, seeking Inspection of Corporate Books and Records Pursuant to 8 Del. C. § 220.

83.    After a pre-trial conference call in which the judge in the Delaware case observed that MIH's counsel had been "less than constructive" in their responses to Plaintiffs' requests, urging them to give the books and records and to settle the case, Plaintiff finally obtained access to certain corporate information, including financial statements, details regarding the payout to the Galen installed executives, and information regarding the Asset Sale. The information was not fully produced to Plaintiff until early 2015.

## III.    Jurisdiction and Venue

84.    This Court has personal jurisdiction over Defendants pursuant to C.R.S § 13-1-124. Defendants transacted business in the State of Colorado, including by sending agents to Colorado or regularly traveling to Colorado to, among other things, attend Board meetings in Colorado where many of the events giving rise to the allegations herein took place. Defendants made misrepresentations to Plaintiff in Colorado, and breached their duties of care and loyalty to the shareholders of Echoserve, MIH, and Unisyn, all with their principal place of business in Colorado.

85.    Venue is proper in this Court because Plaintiff resides in Jefferson County, and Defendant MIH's wholly owned subsidiary Unisyn had its principal place of business in Jefferson County, where the events giving rise to the tortious conduct and breaches of contract alleged herein occurred.

### Count I:  Breach of Articles of Incorporation (Against MIH)

86.    Plaintiff incorporates the allegations contained in Paragraphs 1 through 86.

87.    MIH's Amended and Restated Articles of Incorporation require that the proceeds of any Liquidation Event be distributed pursuant to § 2(a). A "Liquidation Event," or "Change in Control Transaction," as defined by the Charter, means "the sale, lease, or other disposition of all or substantially

all of the assets of the Corporation." Amended and Restated Certificate of Incorporation of Medical Imaging Holdings, Inc., § 2(c).

88.   The Asset Sale constituted a Liquidation Event.

89.   MIH has breached its corporate charter by refusing to return the proceeds of the sale as a return of capital, as required by the charter.

### Count II:  Breach of Fiduciary Duties of Loyalty and Care
### (Against Galen Partners and Galen Directors)

90.   Plaintiff incorporates the allegations contained in Paragraphs 1 through 89.

91.   The Galen Directors, and Galen Partners, as majority shareholders and representatives of the majority shareholders on the Boards of Directors, owe fiduciary duties to Plaintiff and the minority shareholders.

92.   Galen Partners controls the Galen Directors, who act on its behalf.

93.   The Galen Directors have breached their duties of loyalty and care to Plaintiff in at least the following ways:

    a. Prior to the formation of Unisyn, misrepresenting the value of the combined companies, so that Plaintiff, on behalf of the minority shareholders of Echoserve would acquiesce to the transaction whereby Echoserve was rolled into Unisyn;

    b. Failing to disclose critical details about the planned use of the proceeds from the Asset Sale;

25

    c.   Paying out certain Galen-installed executives upon the Asset Sale under the guise that such payments were bona fide severance payments or pursuant to ordinary employment agreements, when in fact the payments were made in order to compensate certain executives for the fact that their stock options were not as valuable as Galen represented they would be; and

    d.   Causing MIH to breach its Corporate Charter by not distributing the proceeds from the Asset Sale as a return of capital, in furtherance of the unique tax or other interests of Galen's own funds.

94.    As part of these breaches of their duties of loyalty, Galen Directors have breached their duty of disclosure by failing, on multiple occasions, to fully and fairly disclose all material information within their control when seeking shareholder action.

### Count III:  Fraudulent Misrepresentation
### (Against Galen Partners and Galen Directors)

95.    Plaintiff incorporates the allegations contained in Paragraphs 1 through 94.

96.    Galen Directors, acting on behalf of Galen Partners, made false representations about:

    a.   The value of the combined companies, prior to the formation of Unisyn, so that Plaintiff, on behalf of the minority shareholders of Echoserve would acquiesce to the transaction whereby Echoserve was rolled into Unisyn (and so that Plaintiff would make a further cash investment in Unisyn);

b.  The planned use of proceeds of the Asset Sale, including the plan to distribute those proceeds as a liquidation payment.

97.   In addition, the Galen Directors, acting on behalf of Galen Partners, made material omissions regarding the details of the Asset Sale, including the planned use of proceeds from the sale.

98.   The representations and omissions were material to Plaintiff, who would not have invested additional funds in MIH, or voted for the various transactions, had the truth and the material facts been disclosed.

99.   Galen Directors made the representations and omissions to Plaintiff knowing that they were false.

100.  Galen Directors made the representations with the intent that Plaintiff take action to his detriment in reliance on the representations, including by acquiescing to the Unisyn transaction and by voting for the Asset Sale.

101.  Plaintiff relied on the representations and the misleading information provided by the Galen Directors, acting on behalf of Galen Partners.

102.  The reliance on the representations and misleading information, including with respect to the use of proceeds from the Asset Sale, caused damage to Plaintiff.

103.   The Galen Directors actively concealed their misconduct by, among other things, hiding the complete books and records from Plaintiff while he was an officer of Unisyn; dismissing Plaintiff from Board meetings and failing to provide material information to Plaintiff; and refusing, until finally sued by Plaintiff in Delaware, to provide information to Plaintiff to which he was already entitled pursuant to the Investor Rights Agreement and Delaware law.

### Count IV:  Negligent Misrepresentation
### (Against Galen Partners and Galen Directors Jahns, Azad, and Williams)

104.   Plaintiff incorporates the allegations contained in Paragraphs 1 through 103.

105.   The Galen Directors, in the course of their business, supplied false information to Plaintiff in guiding him in his business transactions and decision making process regarding his business interests in Echoserve, Unisyn, and MIH.

106.   The Galen Directors failed to exercise reasonable care in obtaining and communicating the information to Plaintiff, particularly with respect to the pro forma financial statements for the combination of Echoserve, Barrington, and Sonora into Unisyn.

28

107.   The Galen Directors were, at a minimum, grossly negligent in conducting due diligence on Barrington and generating pro formas for Unisyn post-combination of the three companies.   As a result, the Galen Directors failed to provide accurate information to Plaintiff.

108.   As a result of Defendants' negligent misrepresentation, Plaintiff suffered losses in the amount of his additional investment in MIH.   Plaintiff would not have made that investment had Defendants presented reasonably accurate pro forma financial statements, as any reasonable due diligence process regarding the combined companies and Barrington's assets would have revealed at the time.

109.   Defendants have concealed from Plaintiff the true financial information for these companies, including the books and records and due diligence that they conducted of Barrington and Sonora.   When certain write-downs to inventory and other assets were made post-combination, Defendants hid the reasons for those adjustments, failing to notify Plaintiff of the circumstances behind the changed corporate valuation.

110.   As part of their pattern of concealment, Defendants entered into an amended employment agreement with Dan Faath, the CFO of Unisyn. The amended agreement was meant to compensate Mr. Faath for the misrepresentations that were made to him regarding the pro formas and the

value of the combined companies, and to keep him quiet about the misrepresentations. As part of their agreement, the Galen Directors told Mr. Faath to keep his arrangement secret. As a result, the CFO, who had uncovered the true and accurate information, did not provide any details of his discoveries to Plaintiff.

111. Defendants' concealment tolls any applicable statutes of limitations.

112. As a result of Defendants' conduct, Plaintiff is entitled to rescission of the deal in which he made his investment in MIH.

**WHEREFORE**, Plaintiff hereby respectfully requests this Honorable Court enter an Order:

A. Requiring Defendants to distribute the proceeds of the Asset Sale in accordance with the Corporate Charter;

B. Granting Plaintiff rescission of his investment in MIH;

C. Awarding Plaintiff compensatory and punitive damages in an amount to be proven at trial;

D. Awarding Plaintiff his reasonable attorneys' fees and costs incurred in bringing this action; and

E. Awarding such other relief as this Court may deem necessary or just.

Dated:  March 5,  2015          Respectfully Submitted,

/s/Glen E. Summers
Glen E. Summers
Bartlit Beck Herman Palenchar &
Scott LLP
1899 Wynkoop Street, 8th Floor
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile:  (303) 592-3140
Email: glen.summers@bartlit-beck.com
Attorney for Plaintiff